Okay, our second case this morning is 23-1262, Krum v. Chubb Limited. Now you may begin. Good morning. My name is Carl Ciceri. I represent Mark Krum, the appellant in this case. I'm going to endeavor to reserve six months for rebuttal, which will be handled by Mr. Krum. This case concerns the dismissal of four different categories of claims relating to Mr. Krum's one-of-a-kind ski home in Beaver Creek, the world's greatest ski lodge, on Christmas of 2019. I plan on discussing the claims themselves and not the discovery-related challenge that we raise. In this case, although I'm happy to talk about anything the court wishes to hear an argument on. I'd like to start with the first category of claims we raised in our brief, the FRV, or fair rental value, claim. Now the court denied that claim on the basis that Krum hadn't established his usual, that he usually, there's so many usuals in this case, that he usually rented the property in the period immediately preceding his cover's loss. Now, putting aside the fact that the court actually cited the wrong provision of the policy, when they reached that conclusion, there is a provision of the policy that does involve usually renting, and we think that the court's conclusion cannot be sustained on the evidence in this case. This home was a home that Krum bought and renovated and spent millions of dollars to rent it out to other people. He had only had a handful of rentals in five years, isn't that right? He had had nine, excuse me, 99 days of rentals in the nine years he'd owned it. There's a period of four years in which he was not able to rent out the property. So that leaves you five years, 99 days. And how imminent had been the rentals? Had he been renting just before the water damage, or what was the last rental? Well, he had actually gotten an inquiry and a commitment to rent the property right before. I'm not asking about an inquiry. When was the last rental, actual rental, compared to when the water damage occurred? It was four years before, but he did have a commitment to rent it in March of 2020, so the rental period hadn't happened, but he had a commitment to rent it out in that period of time. So we think that that counts as usually renting as well. Was that in the record, that he actually had a commitment a few months later, or just that he'd had an inquiry or he was taking inquiries? They had not assigned a rental agreement, but he said I'm going to rent this property, I've reserved it. And that's at Boeing 14-2468-270. And more to the point, though. So even assuming that's the case, and it was to be rented in March, how does that come within the definition of the word usually? Would be rented once in four plus years. We've got two words, and I think both are important. The rented means either to have actual rental transactions or to be offered for rent. That's what hotels do. Even when their rooms are empty, they're renting rooms. That's what a motel does. That's what a B&B does. What's the difference between renting and rented? Well, they're both in trend. I'm not going to grab it. Renting a room is a historic fact. Renting is a process. I see a difference in meaning, but go on. I think it is looking backwards. How many days were you claiming? What were you asking FRV for? How many days? The policy limit is 15 days. We think there's at least evidence of 15 days, although we ultimately think that that's a determination for the jury because he had offered the property for rent for 15 days. Times 20,000. Yeah. But for the very least, we think that the jury couldn't conclude that an average of nine days a year for nine years should equate to at least nine days of FRV, and I think that's a determination for the jury to make. We also think that, like I said, there are two words, renting and usually, and usually means, and I think we all agree, under normal circumstances, so we should at least consider what normal circumstances are and include within the scope of our review of what usually rented means the entire transaction history. What is his normal circumstances for his rental? What is one of the abnormal circumstances? We submit the four years before the covered loss were abnormal circumstances because there was a once-in-a-decade snow loss that depressed not only the rentals in the 2017 to 2018 year, but also depressed rentals in the 2018-2019 year because they didn't know if the snow was going to come back. You never know what's going to happen, and that takes us right into 2019 where that's when Mr. Crum's rental history usually begins. He usually starts to rent the property in the period after Christmas, and that's exactly what we would have had. Was 2019-2020 a good snow year? I don't recall. I mean, offhand. But he had someone who was willing to rent it for two separate occasions during that period. Moving on to the ELA claim. That is the extra living expenses claim. Now, the district court's rejection of that claim was also unfounded because GNIC denied nine different claims for ELE benefits from Crum, and each one of those was a breach of contract and a breach of the duty of good faith. I was a little confused on that. He says, I want to rent this house, and then Chubb said no. Where was he staying? He was staying at the Ritz, or what was going on? He was staying in a portion of the property in which they didn't have a functioning kitchen, kind of part of the owner's quarters, but it was very damaged, so he obviously needed to move on. He found a series of four rentals that he proposed before January 27th. For each of those, they said, we're looking at them, we're reviewing them, we'll get back to you on them, and they never did. We get to January 17th, and after that, he makes a series of accommodations. And by the way, for each one of these, he's contacted the property owner. He has inquired and negotiated a special rate and special base for the property in the period, and after January 27th, they put him off. They say, well, now we haven't established your usual vacation occupancy of the home, a requirement that's only in the policy, because the brokers probably erroneously put him in a vacation policy rather than a true homeowner's policy. Was that accidental? I thought he said, I want a cheaper premium, and that was the only way they could get a cheaper premium. Well, they promised that they could get the same coverage, and the only thing that he was trying to avoid was a construction surcharge. So they said, we need to do the same coverage with a lower construction surcharge, and that's why he went from his charter's policy to his GNIC policy. And I'd like to just briefly get onto the broker's claim, because I think it's worth getting into as well. The essence of the court's denial of that claim was its conclusion that he had not established causation. The conclusion is really circular. The court says, well, I can't establish that he exceeded the policy's limits because he didn't establish he was entitled to coverage under the policy. Of course, we think he did establish he was entitled to coverage under the policy, but it's both the limits of the policy, that is the 15 days limits on FRB, and the 60 days supposed limitation on ELE coverage. Those limits, as well as the preconditions on coverage, like establishing usual vacation occupancy or establishing that he usually rented, we think those are both in violation of his express instructions to get maximum unlimited ELE and FRB with no exceptions. I'm a little confused about that argument. I guess if we disagree with you that the extra living expenses, the ELE, or the rental, fair rental value, if we disagree and we think that it was paid, then what's left? Because why would there be any claim against the brokers that they should have gotten him an even greater maximum if he couldn't even have met the maximum that he had? Well, he would have had these claims. In terms of causation, the broker's negligence prevented him from being put in a policy that wouldn't have required him to establish his usual vacation occupancy, so he wouldn't have had coverage. The broker's negligence put him in a policy that made it require that he had to establish that he usually rented it in order to get any FRB coverage. That was something that was not in the charge's policy. So our contention is that the negligence is in not putting him in a policy that would have created the conditions whereby he would have been denied. Or as to living expenses, put him in a policy where he didn't have to prove expenses to get the maximum recovery, which is your argument, right? Well, I mean, I think the policy itself doesn't require that the loss is being incurred. And that's not that he doesn't have to experience these expenses. He has to have a covered loss, and he has to have a need for the expenses, but incurred is not a requirement in the policy. A reasonable increase in your normal living expenses is what's required. Right. An increase in your normal living expenses. How would you not have to incur those expenses to have a reasonable increase in expenses? Well, again, he would have had those increases if they had not been denied. And I think that that ultimately goes to the bad faith of the insurers in the policy. They imposed a condition. You have to get approval from us on whether you're going to get a property. They deny approval. Did they ever deny any living expenses? They denied nine different requests for living expenses. They denied them or they just didn't? Where's the denials in the record? Well, I mean, they never got back to him on any of the four. Right. There was no denial. I would consider a delay of indefinite duration when you have a time requirement. When he submitted the receipts from the RIFs, they reimbursed him for that, didn't they? Only for that one rental, yes. But for the others, they completely denied. What other expenses or receipts did he submit that he wasn't paid for? There were no other. He decided not to take those use of education loans. So he wants $4 million more, but he only submitted the $22,000 receipt for the Ritz Carlton. That's correct. And that's either because of bad faith, which denied him the benefits he was entitled to, the benefit of his borrowing, or because of anticipatory repudiation. They declared to him that they were not going to honor their obligation as a policy, and that excuses him of his obligations. He should get the benefit of the bargain, the expenses that he would have incurred, but for their interference, but for their repudiation, and that he was entitled to a policy. I'd like to reserve the remainder of my time for rebuttal, if I could. Thank you. All right. For the appellee, Mr. Palmieri. Mr. Hacker, you're on first. Good morning, Your Honor. I'm going to please the Court. John Hacker for Great Northern. I'm going to try to reserve two or three minutes for my colleague, Mr. Palmieri, who will argue the broker's issues on behalf of the brokers. After Mark Crum's vacation house was damaged by sprinkler malfunction on Christmas Eve 2019, Great Northern immediately came on site, investigated, and timely paid more than $4 million to repair or replace damaged areas of the house and its contents. And immediately, upon the conclusion of a normal, contractually contemplated appraisal of damage to the home theater system, Great Northern promptly paid an additional $1.2 million to repair that damage as well. The principal issue here, as we've heard this morning, is whether Mr. Crum is also entitled to reimbursement for the fair rental value of a vacation house he had not rented for years, and for the cost of alternative housing he never paid for or lived in. And he also contends he should have been allowed to try his bad faith claims before a jury. None of his claims has merit. I'll start where my colleague started, my friend started, with the additional living expenses claim concerning the fair rental value of the home. That provision provides that if a covered loss makes a part of your house or other permanent structure which you usually rent to others, uninhabitable, we cover its fair rental value during the period of time it is usually rented for a reasonable period of time or up to 15 days. So he has to prove, to invoke that coverage properly, this house is usually rented to others, and he has to show the period of time it is usually rented. And he didn't show that his house was usually rented to others, as we've already heard this morning. It had not been rented to anybody since December, January of 2015. So it was for four years without renting at all, and by no common understanding of the phrase usually rented is never renting at all. Do you agree, though, that if there is an episodal reason why you're not renting, you're remodeling the house, that that period wouldn't count against your effort to show usual rental? I don't know if I can answer that in a categorical way. I mean, if you choose not to rent for years because it takes you years to, you know, remodel the house, then it's not in that period of the house that you're usually renting. But I'm not taking issue with the one year in 2010 and 11 when he didn't rent. That's not really part of the calculus. The point here is that for four years, for various reasons, he didn't rent. It just wasn't a house that was usually rented. He blames, you know, bad snowfall in one year as a reason, but in the year immediately prior to the rental period, the year before this supposedly bad year of snowfall, he wasn't renting either. If there had been just a two-year gap instead of a four-year gap, is that usual enough? You know, there's going to be edge cases, Your Honor. I don't know a two-year gap. And if we show a really consistent pattern for a long time and for two years, and there's some sort of understandable reason it doesn't look like it was a choice by him not to rent, one can imagine a different outcome. I'm not committing to that, but that's not the facts we have. Why isn't that a fact question for the jury that would, you know, look at his reasons for the rentals? Right. I'm agreeing at some point, you know, the facts can look, somebody could reasonably conclude that a period of time is usually rented. I want to emphasize it's not just a temporal dimension. It's the regularity, right? And both are missing here. You don't have four years. You don't have these regular, you know, over that period of time. So if it's, you know, one year or two years within a four-year period, that's just a different inquiry. And so just because it involves facts doesn't mean it gets to a jury because the question is whether a reasonable jury would conclude that not renting it at all for four consecutive years qualifies as usually renting to others. Do you think, I mean, I was surprised by his argument that because the snowfall was bad, that gives me an out. I didn't see anything in the contract that said that. I think the contract says usually rent it, and you can have a reason for your own house why there might be an exception, but you can't simply say, well, the snowfall was bad because there's no force majeure, or this would be something quite a lot short of force majeure in any event. I completely agree. It says usually rented, which has the temporal and regularity dimensions. But it doesn't have an exception for bad snow or bad weather. No, that's completely right. The only thing I might concede in that area is if there is like, you know, it's not usually rented because one year, for example, because of COVID, he just literally couldn't. It was like prohibited renting. You know, there's a government order. It just was absolutely zero market whatsoever, you know, for one year. That might actually kind of fill the gap in a regularity element. If you've been going year after year, then one year you just can't do it, but you try to, and, you know, your bars are doing it. Okay. Maybe that's still usually renting it. But here we've got four years with one year of bad snowfall and just other years where there's no explanation other than the fact that just descriptively undisputed that he wasn't renting it at all. What's the explanation? I'm just moving to the incurred. What's the explanation for the Great Northern's denial of the substitute properties to live in? So the district court said there were two reasons for granting summary judgment. One was they hadn't actually incurred any of the – there was no reasonable increase. It just didn't exist. But the other one, remember, was that the denials were not improper. And when you look at the record throughout January, counsel's just incorrect in saying that Great Northern didn't explain. What was going on was Crum was demanding that Great Northern approve rentals for a year, 300 days, at $20,000 a night. And then at one point he negotiates one of them down to $5,000 a night for a year-long rental, and they're demanding a year-long commitment. And what Great Northern's claims adjuster says on January 2nd, as reiterated in the Reservation of Local Rights letter on January 17th, is you have to – we're still trying to figure out your usual vacation occupancy. And we don't have any evidence so far that would support the idea that your usual vacation occupancy is every day for an entire year or every day for 300 days. So we can't approve these exorbitant, incredibly luxurious rentals, which are dependent upon the long-term lease. That's what they say on January 17th. They explicitly explain that on January 17th as to why they haven't been able to sign off on the requests before that date. And then that same thing, that same dynamic is continuing where they're trying to establish or investigating to determine what his usual occupancy is. And it's not until the middle of March, March 27th, when they say, Okay, look, we agree based on the documentation you've submitted that your usual vacation occupancy is at least 60 days. But all that period in January, February, and March— When was that agreement reached? What date did you say, March? March 27th is the date. They have a meeting with all the Roman people, and then it's reported at the meeting. It's recorded in an email on March 29th that they have told Crum that they agree that he has established usual vacation occupancy. And if you just look at the literally hour-by-hour, day-to-day communications and email responses, that's what they're trying to determine. That's always the reason that they're not— Now, let me clarify one thing that counsel said, which is Great Northern never— didn't demand the right to approve in advance and prohibit him from getting these other contracts and other leases if he wanted to. Great Northern was just saying, we're not in a position to approve it because we haven't established your usual vacation occupancy. I don't want to get in a fight on the semantics of whether that constitutes a denial, because it is true that Great Northern wasn't agreeing that he should go ahead and sign a lease and that Great Northern would cover it, because if Great Northern agrees to cover it, they can't agree to cover it until they've established his usual vacation occupancy. So they're not agreeing to cover, but there's not any sense in which they're prohibiting him from entering a lease and incurring these expenses and then submitting them and establishing that, well, here's the period of time during my usual vacation occupancy, which I incurred a reasonable increase in living expenses, and I want you to cover them. That's how this should have worked. That's how it was. Well, do you agree that he only made one explicit request for living expenses backed up by a bill that he paid? Well, for the alternative housing, yes. He had $22,000 that was paid when he stayed at the Ritz Carlton. In the brief, they keep referring to it as a temporary hotel, like it's Bob's Hotel down the street. It's the Ritz Carlton Bachelor Gulch House. That's where he stayed. And we kept saying to him throughout January, please go stay at the Ritz Carlton Bachelor Gulch, so the demolition can proceed on the house and all that. And he didn't do it. We approved a 13-day stay at the Ritz Carlton Bachelor Gulch in Beaver Creek, not far from his home. And unfortunately, it's right as COVID hits and the hotel closes. But that's what we're offering. And we actually paid when he did stay for seven days at the Ritz Carlton Bachelor Gulch. We paid it. Now, we also paid all kinds of additional living expenses in terms of food and housing for his dog, because they correctly say the part of the house he was living in didn't have a functioning kitchen, so we paid for very generous food expenses. He has no complaint with that. He has no complaint with the $4 million and then $5 million. Well, they argue it was bad faith, the lowball, the theater system. And there's a pretty big million-dollar delta there. What's the explanation for that? Well, the explanation is it's based on, unlike in all the cases they cite, it's not just a lowball estimate where it's the insurer kind of rolling his eyes and throwing out a number. It's based on its own experts. And nobody questions that J.S. Held and the Dr. Hajam that were retained, timely retained, did all the work by Great Northern, were experts and gave what they thought was an appropriate estimate. It turned out that it was all about the scope of work was the ultimate difference, that there were things that J.S. Held, that our experts— again, nobody questions that the experts weren't doing their best to give us their— and nobody questions that we relied on these experts, unlike in the bad faith cases like Blakely that they cite. But what was going on is the experts later realized and sort of developed during the appraisal process that there was just a misunderstanding about what was included in the contents of the house, what was in the theater, accounted as part of the theater system versus what was part of the house itself.  And then there was a whole question about low-voltage electrical system, which was $250,000. After the appraisal is commenced, we realize, the evidence comes out, that we learned for the first time that that's supposed to be included. Why aren't those jury questions to me? The evaluation of these communications. Because most of what I just said is not disputed. The only point that they rely on to say that there is a bad faith jury question is the delta between the two. And there's all kinds of case law that says a mere difference between the two isn't enough to establish bad faith. What I would absolutely concede, and because I think it's right, is that when you have a substantial delta, that might get you to discovery, to figure out why does that delta exist? Is the insurer just folding its hands and refusing to do the kind of work we expect of insurers? And that happened here. They had full discovery, except for the one deposition that's completely irrelevant. I don't know what they complain about. But they had full discovery as to what was going on. And when you lift the hood, scratch the surface, on why this delta existed, it's perfectly clear. We had experts. We relied on the experts. Again, that's not disputed. The fact that they are experts is not disputed. The fact that they did their inspection work, they were trying to communicate with their expert about what the basis for their opinion was, it all gets worked out. Did you want to give Mr. Palmeiris some time? If there's no other questions on these issues, we would ask the Court to affirm. Thank you very much. May it please the Court, John Palmeiris occurring on behalf of the broker defendants. Thank you, Judge Tinkovich, for two minutes. Judge Moritz teed this up and presented the issue correctly in terms of the broker defendants. If they have not even exhausted the coverage limits at issue under the Chubb policy, nothing is left to prove causation, which is where Judge Moore went, that they failed to prove causation in this case. Three points. First point is the language. The language of the policies, and the only two policies in the record, are the Chartist policy that predated the Chubb policy, and then the Great Northern and the Chubb policy that followed. The idea that you can argue when we have unlimited coverage, you have to show beyond speculation what coverage would have been available to them, and their argument is limited to the Chartist policy. The language is identical, usually read to others. The language in terms of the ELE is substantially similar. Reasonable increase in living expenses to maintain household's usual standard of living. If they do not, if Mr. Crum, in this case, a plaintiff, does not exhaust those limits, there's nothing in the Chartist policy that would have provided the causation, the link here to say, I would have gotten a different result under the Chartist policy. The conditions of coverage are identical. If you haven't exhausted the 15 days, then there's nothing there for the broker. So the only big difference in the policies was the duration of coverage, or I mean, is the extent of the coverage basically the same? But the other difference was that this was a vacation rental home, so there was a condition in the new policy that didn't exist in the old one. No, Judge Eagle, there really wasn't. Not on the FRB. Usually read to others is identical. It's 15 days. But if you haven't exhausted the 15 days, there's no causation. And that's the only difference. It's that and which. One policy says that, and one policy says which. In terms of the ELE, there is some very slight differences, but it is, and you can compare and recite, reasonable increase in living expenses to maintain your household's usual standard of living. Same. Substantially similar. If I may just have one minute to wrap up. Go ahead and wrap up. In terms of the causation, under the Gibbons v. Ludlow case, Judge Moore concluded that the burden is on them to present that evidence to prove a different result. They failed to meet that burden accordingly. They failed to present a crucial element, and therefore their claim fails. I'd be happy to address any other questions the panel may have. Otherwise, we ask that you affirm summary judgment. If it's affirmed for Great Northern, it follows for the broker defendants. But in any event, the broker defendants on their own have a causation basis, and we ask that you affirm. Thank you, Counsel. Thank you. Is it rebuttal time? Yes, Your Honor. Mr. Crum. I'm Crum on behalf of myself. It's a privilege to be before Your Honor. Thank you for the opportunity. Let's, if we may, if I may start off, I'm going to answer each of your questions that I believe were not answered accurately, correctly, or truthfully under the record before you. Okay, let's first start off and let's lift up the hood as our counsel on the other side stated. I'll go backwards a little bit so maybe it's easier with the brokers first. The brokers are saying, well, wait, you need to exhaust his coverage. First of all, the record supports factually that I asked for the coverage to be the same as Chartist. I wanted unlimited ELE and unlimited FRV. Why did Crum want unlimited ELE and FRV? Because Crum just built a $24 million house, okay, that he bought for five and spent five years constructing it to be the world's greatest ski house, okay? Now, what's the world's greatest ski house? That's making sure in Bell Valley no house will come close, okay, to make it the house of choice of the upper, upper echelon of wanting to rent houses. We have declarations and affidavits of people that would testify to support that. The first year I got the house, I told my brokers a month before I bought the house. Luckily, they did an internal document that was never provided us till discovery. I will rent this house, okay, at 30 days minimum a year. That is what I intend. I may not be able to do that because I may not find people that are willing to pay the rates that I need to justify the risk of renting a house that's a $20 million house with $2 million of art and millions of dollars of antiques. I know how blessed and lucky I am that that's the insurance I got, you know? If you want insurance for your Ferrari or your 911 that you're so blessed to have and you want insurance to be able to drive those cars, whether in total your insurance company that's saying we're going to give you that but then gives you the pinto for your honors to go from point A to the courthouse, you may be able to get there, but that's not what you paid for. That's not what your insurance company was obligated to pay. That goes to the ELA. Of course, the night at the Ritz that I stayed. I stayed seven nights at the Ritz. In a one-bedroom in the height of ski season at my preferred Marriott rate, which was hundreds of dollars less because I'm the highest status, then someone else would be able to stay there. That was $1,000 a night. That was seven nights in the middle of some of my demolition that took 90 days. That was dangerous. There are no scientists. I have sites for all this. I have 29 seconds. I can give you a site for everything I'm saying if I'm permitted to go a minute or two longer. There are no scientists. Not my scientists. Chubb scientists. January 8th, less than two weeks of the insured event. Get him crumped out of the house because they are now doing remediation. The insurance company, my insurance company, is instructing me to start with remediation. What does that mean? That means anybody going in and out of that house are wearing these white hats. Are we talking about the ELE here? Well, we're talking about both, your honors. Because I just wondered, Mr. Hacker said, well, they had to establish the usual days that you spent in Beaver Creek to establish what would be a reasonable substitute housing. Isn't that what happened? That's what happened. Nobody brought up for the first 35 days usual vacation occupancy. That's the first thing with regard to ELE because they want to show, hey, does this guy really use his house before we're going to let him have ELE, extra living expenses? I showed them within days, not months, within days, that I was at that Colorado residence 152 days for the past two years. It turned out to be five days more in one year. I gave them every airline ticket that I flew, every airline ticket, receipt, my credit card voucher, to and from where I flew, either Philadelphia, New York, LA, my practice. Are you going back to bad faith now or are you talking about ELE? It's ELE because they're saying I have to establish usual vacation occupancy. It is also bad faith, Judge. If I can show them that I was at my house 257 days in two years and my insurance company, my insurance company protecting me, saying I only get 60 days, well, I disagree with that. But how could they not say I established my usual vacation occupancy immediately when I was at my house 257 days? Well, you're over time. Why don't you go ahead and wrap up. Okay. And that means 10 seconds. So first just about how they were so concerned to get me into a hotel. Okay, and that's what they promised me. Well, I have nine separate requests getting into hotels. All of them were denied. Or, as Your Honor asked, we're looking into it. But when the hotel request is two weeks ahead of time because I'm having business colleagues or family coming out and they never respond by that date, isn't that the effect of a denial? All right. Thanks for your argument. Time's expired. The case is submitted. And we'll take a brief recess.